Leonard A. Bellavia, Esq. (lbellavia@dealerlaw.com)
Shaun M. Malone, Esq. (smalone@dealerlaw.com)
**Bellavia Blatt & Crossett, PC**
200 Old Country Road
Suite 400
Mineola, NY 11501
(516) 873-3000

Attorneys for the Plaintiffs

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------- x
      :
Fairfield Motors, Inc. d/b/a Route 23 Honda,  :
Adjess Motors LLC d/b/a Route 46 Chevrolet,  :
and Alfred Stein, Inc. d/b/a Keystone Volvo of  :
Berwyn and d/b/a Keystone Volvo of  :
Doylestown, Individually and on Behalf of All  :
Others Similarly Situated,  :
      :
      :
      Plaintiffs,  :
  vs.  :
      :
Autotrader.com, Inc.,  :
      :
      Defendant.  :
      :
      :
------------------------------------------------- x

Civil Action No.

**CLASS ACTION COMPLAINT**

**Jury Trial Demanded**

Plaintiffs, Fairfield Motors, Inc. d/b/a Route 23 Honda and Adjess Motors LLC d/b/a Route 46 Chevrolet, and Alfred Stein, Inc. d/b/a Keystone Volvo of Berwyn and d/b/a Keystone Volvo of Doylestown, individually and on behalf of all others similarly situated, by their undersigned attorneys, as and for their complaint against the Defendant, Autotrader.com, Inc. ("Autotrader" or "Defendant"), alleges the following the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters:

## INTRODUCTION

Autotrader is an online website that advertises new and used automobiles for sale by automobile dealers and individuals, for a fee, as well as advertisements for automobile dealers in general. The Plaintiffs own and operate automobile dealerships in the states of New Jersey and Pennsylvania, all of whom have paid, collectively, millions of dollars in subscription fees to Autotrader to advertise their vehicles for sale on Autotrader's website. The Plaintiffs were induced by Autotrader to pay subscription fees based upon certain representations made by Autotrader and its agents as to the advertising reach that Plaintiffs would supposedly receive, and was purportedly receiving, by utilizing Autotrader's online marketing services.

The manner in which automotive dealers advertise and sell automobiles and trucks has changed dramatically in recent years.  In the past, consumers were primarily led to dealers by physically visiting their local dealerships and inquiring about vehicles, or by viewing printed advertisements placed by dealerships that featured a limited sample of the vehicles the dealers had for sale. Consumers had little ability to easily compare vehicles and prices as between different dealers. The internet eventually provided consumers with the ability to access extensive information about different dealers' vehicles available for sale, and at what prices and terms. As a result, now a significant percentage of new and used vehicle purchases begin with online searches by consumers and, thus, dealers have had to adapt their marketing and advertising accordingly.

To appeal to online shoppers, most automobile dealerships set up their own websites for advertising and promotional purposes. In addition, some dealers go one step further, and use premium third-party advertising websites such as Autotrader.com, Cars.com, Truecar.com, and many other online advertising providers. Those advertising providers allow dealers to post their

vehicle inventory online in ways that resemble traditional television commercials and print advertisements, but with functionality which allows consumers to search for particular types of vehicles offered for sale, and to compare the vehicles' options, pricing, and other material details. Consumers who enter search criteria for a particular type of vehicle are shown search results that list the vehicles for sale by specific dealers, from which the consumer can compare and choose. Some dealers pay significant sums of money to internet advertisers such as Autotrader in hopes of driving consumer traffic to their dealerships. Most internet advertisers, such as Autotrader, offer consumers free access to their website to search for vehicles, and derive their revenue substantially from dealers that purchase advertising packages that typically give dealers the right to post a certain number of individual vehicles for sale at a given time.

Autotrader, through its advertising and promotional activities, targets potential dealer customers in a number of ways, such as by making personal sales calls, by providing printed advertising and marketing materials, by e-mailing advertising and marketing materials, and through other means. Autotrader's marketing and advertising communications emphasize, as the primary selling point to dealers, a number of statistical metrics that are designed to convey the purported efficacy and benefits of the Autotrader's online advertising. However, the "advertising reach" metrics that Autotrader used to induce the Plaintiffs and other dealers to purchase its online advertising services were false and misleading.

Autotrader, among other false statements to the Plaintiffs, falsely inflated, by as much as one hundred percent (100%), the number of "search results pages" (or "SRPs") and the number of "vehicle detail pages" (or "VDPs") that the dealers were actually experiencing.  Moreover, the evidence suggests that Autotrader knowingly and intentionally concealed, actively and by omission, the fact that it was providing inaccurate SRP and VDP data to its existing and

prospective dealer customers.  Autotrader's intent in providing inflated SRP and VDP statistics to its customers was to fraudulently induce them to purchase internet advertising packages from Autotrader in the first instance.  Thereafter, Autotrader communicated false and misleading advertising results to its dealer customers to convince them to purchase upgrades or premium services, or simply to help ensure that dealers remained Autotrader customers instead of pursuing alternative sources of advertising.

Autotrader's misrepresentations to the Plaintiffs and to all of its dealer customers regarding the statistical effectiveness of its online advertising results have caused substantial economic losses to the named Plaintiffs and to all members of the Class. Autotrader made those misrepresentations by electronic means, which constituted wire fraud in violation of 18 U.S.C. § 1343, and by use of the United States mail, which constituted mail fraud in violation of 18 U.S.C. § 1341.  In addition, the Defendant's predicate acts of wire fraud and mail fraud were committed as part of a pattern of racketeering activity in violation of the RICO Act (18 U.S.C. § 1961 et seq.); constituted deceptive acts in violation of New Jersey's Consumer Fraud Protection Act (N.J. Statutes § 56:8-1 et seq.); and constituted violations of Pennsylvania's Deceptive and Unfair Trade Practices Act (73 Pennsylvania Statutes § 201-1, et seq.).  In addition, the Defendant is liable to the Plaintiffs for its misrepresentations to them under common law doctrines of breach of contract, fraudulent inducement, negligent misrepresentation, and under the equitable doctrine of unjust enrichment.

## THE PARTIES

1.      Plaintiff Fairfield Motors, Inc. d/b/a Route 23 Honda ("Fairfield") is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business located in Pompton Plains, New Jersey, and is engaged in the business of buying and selling automobiles and trucks.

2.      Plaintiff Adjess Motors LLC d/b/a Route 46 Chevrolet ("Adjess") is a limited liability company organized and existing under the laws of the State of New Jersey, with its principal place of business located in Budd Lake, New Jersey, and is engaged in the business of buying and selling automobiles and trucks.

3.      Plaintiff Alfred Stein, Inc. is a Pennsylvania corporation with its principal place of business being located in Berwyn, Pennsylvania, and does business under the trade names "Keystone Volvo of Berwyn" and "Keystone Volvo of Doylestown."

4.      Defendant Autotrader.com, Inc. is a corporation organized and existing under the laws of the State of Delaware, and is authorized to business in New York by the New York Department of State, with its principal place of business designated as being in Suffolk County, New York.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. 1332 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367. The Court has jurisdiction (a) pursuant to 28 U.S.C. Section 1331 because this Court has original jurisdiction of all civil actions arising under the laws of the United States (i.e., Racketeer Influenced and Corrupt Organizations Act 18 USC 1961 et. Seq.) and (b) pursuant to 28 U.S.C. 1332(d) as the proposed class consist of 100 or more members, the aggregate claims of the putative class members exceed $5 million dollars, exclusive of interest and costs, and at least one of the members of the proposed class is a resident of a different state than the Defendant.

6.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. 1367 because all of the state claims arise from a common nucleus of operative fact with the federal question claims such that the Plaintiffs would ordinarily expect to try them in one judicial proceeding.

7.     This Court has personal jurisdiction over Defendant Autotrader by virtue of its transacting and doing business in this District and pursuant to N.Y. C.P.L.R. § 302(a), and by virtue of it having designated its principal place of business to be in Suffolk County, New York. Autotrader has transacted and done business in the State of New York and in this District and has disseminated its false advertising and information in the State of New York and in this District.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a corporation subject to personal jurisdiction in this District and has designated its domicile and principal place of business in New York to be in this District.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District, including Autotrader's dissemination of false advertising and its communication of false information in this District.

10.     Plaintiffs bring this action for themselves and on behalf of all automotive dealerships that have advertised motor vehicles for sale on Defendant Autotrader's website during the applicable statute of limitations period ("Class Members").

## FACTS COMMON TO ALL COUNTS

11.     Defendant Autotrader owns and operates an online advertising service that charges motor vehicle dealers for the right to list individual vehicles for sale on its website under the domain name "www.autotrader.com" ("the website").

12.      Prospective vehicle purchasers ("consumers") are permitted free access to the website, where they may conduct free database searches for specific motor vehicles currently offered for sale by dealers.

13.     Prospective vehicle purchasers specify certain parameters by which the website's software conducts a search of the database of vehicles listed for sale by Autotrader's automotive dealer customers.

14.     Prospective purchasers may enter search parameters for the vehicles they seek, which include, but are not limited to, the year, make, model, trim, optional equipment and price, as well as the geographic location of the dealers that offer matching vehicles.

15.     The website's software then returns database search results to consumers in the form of a list showing all vehicles for sale within its database that meet the consumers' search parameters.

16.     Autotrader utilizes a certain metric to keep track of the number of times a particular dealer's vehicles are included in consumers' vehicle search results.

17.      Autotrader refers to each incident in which a dealer's vehicle appears in a consumer's search results as a "Search Results Page" (hereinafter, "SRP").

18.     Upon information and belief, Autotrader only counts a vehicle that is included in search results as an SRP if the actual page on which the vehicle is listed is viewed by the consumer.

19.     Upon information and belief, Autotrader does not count as an SRP instances in which a vehicle appears in search results if, for example, a vehicle is listed on the page three of the search results, but the consumer only clicks through to page two of the search results.

20.     Autotrader, in its marketing, advertising and direct sales presentations to prospective dealer customers, as well as in its performance reports to existing dealer customers, touts the SRP metric as the key indicator of the value that dealers receive for purchasing Autotrader's advertising packages.

21.     Autotrader, in its marketing and advertising materials, in its direct sales presentations to prospective dealer customers, and in its performance reports to existing dealer customers, draws an analogy between the number of times a dealer's vehicles appear in search results pages (i.e., its SRP's) and the number of times customers would have physically visited the dealership under the classic "brick and mortar" marketing era.

22.     Autotrader also utilizes a performance metric known as "Vehicle Detail Pages (also referred to as "VDP's).

23.     Autotrader defines a "VDP" as the number of times consumers actually "click" on a particular vehicle that appears in vehicle search results in order to view all of the details of the vehicle, including options, pricing, terms, photographs, etc. In the internet industry, this metric is analogous to the "click through" rate.

24.     The VDP's counted for a particular dealer are, naturally, a subset of its SRP's, because not every vehicle that appears in a search results page will be "clicked" by the consumer such that the consumer can view that vehicle in detail.

25.     Autotrader, in its marketing and advertising materials, in its direct sales presentations to prospective dealer customers, and in its performance reports to existing dealer customers, draws an analogy between the number of times a dealer's vehicles are viewed in detail (i.e., its VDP's) and the number of times customers would have physically visited the dealership and inquired about a specific vehicle for sale in the classic "brick and mortar" marketing era.

26.     Autotrader also offers dealers a premium add-on service known as "spotlighting."

27.     Autotrader claims, and specifically represents to dealers, including the Plaintiffs and the Class Members, that "spotlighting" ensures that a dealer's vehicle that meets the consumer's search parameters will appear at the top of the first page of the search results, resulting in higher SRPs, because the consumer automatically sees at least the first page of the search results.

28.     In or about October 2010, Autotrader's sales representative solicited Plaintiff Fairfield Motors, Inc. to become an online advertiser on Autotrader's website, and Fairfield began utilizing Autotrader's online advertising services on November 1, 2010.

29.     In or about October 2010, Autotrader's sales representative solicited Plaintiff Adjess Motors, LLC to become an online advertiser on Autotrader's website, and Fairfield began utilizing Autotrader's online advertising services on November 1, 2010.

30.     In or about June 2008 Autotrader's sales representative solicited Plaintiff Adjess Motors, LLC to become an online advertiser on Autotrader's website, and Fairfield began utilizing Autotrader's online advertising services on November 1, 2010.

31.     Autotrader's representatives and agents provided written marketing materials, both printed and electronic, to each Plaintiff in conjunction with its attempt to sell its services to the Plaintiffs.

32.     Autotrader's representatives and agents also met with representatives of each Plaintiff to discuss Autotrader's online advertising services and to attempt to induce the Plaintiffs to utilize those services.

33.     The marketing materials that Autotrader's representatives and agents provided to the Plaintiffs, both via e-mail and in printed form, explained the concept behind Autotrader's SRP and VDP metrics, and emphasized the analogy between SRPs equating to consumer visits to the dealership and VDPs being tantamount to consumer inquiries about a specific vehicle for sale.

34.     Autotrader's representatives also verbally explained to the Plaintiffs' representatives Autotrader's SRP and VDP metrics, and how those statistics measured and reflected the benefits to dealers of using Autotrader's advertising services.

35.     Autotrader's representatives, verbally, and in written documents provided to the Plaintiffs, both electronically via e-mail and in printed form by mail and by hand delivery, offered specific examples of existing dealers' SRP and VDP results, including specific monthly SRPs and VDPs achieved by other dealers in similar markets.

36.     Upon information and belief, the SRPs and VDPs purportedly being achieved by other dealers which were communicated by Autotrader's representative to the Plaintiffs were, in fact, inflated by between 50% and 100% (or more).

37.     Each of the Plaintiffs, in reliance upon the aforesaid false and misleading representations of Autotrader's representatives as to the advertising reach enjoyed by other dealers, and thus anticipating the advertising reach that it could itself achieve through Autotrader's platform, decided to enroll in Autotrader's online advertising program on a month-to-month basis and/or indefinite basis.

38.     Autotrader sold each Plaintiff a monthly online advertising package that entitled each Plaintiff to list a certain number of vehicles for sale on Autotrader's website.

39.     At no time since the Plaintiffs began utilizing Autotrader's advertising program in and continuing until today have the Plaintiffs ever entered into a long term online advertising agreement with Autotrader.

40.     At all times during its business relationship with Autotrader, the Plaintiffs had the right to terminate, or not renew, their agreements with Autotrader.

41.     Upon information and belief, on or about the fifth (5th) day of the month following each Plaintiff's first month of advertising on Autotrader's online platform, Autotrader communicated to the Plaintiffs what Autotrader represented to be accurate metrics reflecting the advertising reach that the Plaintiffs had purportedly achieved through Autotrader's online platform during the relevant month and/or the prior months.

42. The communication of the Plaintiffs advertising reach results was in the form of a report created by Autotrader which is currently called a "Dealer Scorecard," as well as a spreadsheet referred to as a "Performance Tracker," which compared the current month's SRPs and VDPs to those of prior months.

43. The aforesaid communications from Autotrader to the Plaintiffs was transmitted by Autotrader via electronic mail addressed to each Plaintiff's principal and/or manager, as well as being available to dealer customers online at Autotrader's website.

44. Upon information and belief, the number of "search results pages" (SRPs) achieved by the Plaintiffs during their first month using Autotrader, and every month thereafter, as reported in Autotrader's Dealer Scorecards and in other communications, was inflated by 50% to 100% or more above the number of SRP's that the Plaintiffs had actually received.

45. Upon information and belief, the number of "vehicle detail pages" (VDPs) achieved by the Plaintiffs during their first month using Autotrader, and every month thereafter, as reported in Autotrader's Dealer Scorecards and other communications, was inflated by between 50% and 100% above the number of VDP's that Plaintiffs had actually received.

46. Upon information and belief, Autotrader's website was programmed by Autotrader such that its "counting" software "double-counted" the number of vehicle search results pages (SRPs) viewed by consumers for certain types of search inquiries.

47. Upon information and belief, Autotrader's website was programmed by Autotrader such that its "counting" software "double-counted" the number of vehicle detail pages (VDPs) viewed by consumers for certain types of "click throughs."

48.     Upon information and belief, Autotrader knowingly and intentionally programmed its "counting" software to inflate the number of SRPs and VDPs recorded for its customers, including the Plaintiffs.

49.     Upon information and belief, Autotrader had actual notice that its "counting" software inflated the number of SRPs and VDPs recorded for its customers, including the Plaintiffs.

50.     Alternatively, Autotrader should have known, upon the exercise of reasonable diligence, that its "counting" software inflated the number of SRPs and VDPs recorded for its customers, including the Plaintiffs.

51.     Despite Autotrader's knowledge that its "counting" software inflated the number of SRPs and VDPs recorded for its customers, including the Plaintiffs, upon information and belief Autotrader used that inaccurate and misleading SRP and VDP data as the basis for its monthly "Dealer Scorecard" reports to the Plaintiffs and to other dealer customers between April 2010 and June 2015.

52.     Autotrader's primary intent in communicating the aforesaid misleading and inaccurate monthly SRP and VDP results to Plaintiffs and other customers was to ensure that the Plaintiffs would continue utilizing and paying for Autotrader's internet advertising services.

53.     Autotrader's secondary intent in communicating the aforesaid misleading and inaccurate monthly SRP and VDP results to the Plaintiffs and to other customers was to induce the Plaintiffs to purchase additional "premium" utilities above its base internet advertising

subscription, such as "spotlighting," and to continue utilizing and paying for those premium utilities after they were initially added to Plaintiffs' account.

54.    The Plaintiffs have remained as continuous paying users of Autotrader's online advertising platform until the present.

55.    On or about the 5th day of every month from the time of each Plaintiff's first month as an Autotrader customer and until the present, Autotrader continued to send, via mail and e-mail, in substantially the same form, monthly "Dealer Scorecards" and/or "Performance Tracker Reports" to the Plaintiffs.

56.    Upon information and belief, each of the monthly Dealer Scorecards and/or "Performance Tracker Reports" sent by Autotrader to the Plaintiffs during the aforesaid periods of time contained the previously-described misrepresentations as to the number of SRPs and VDPs that the Plaintiffs were receiving from Autotrader's online platform.

57.    Upon information and belief, in or around December 2014 an information and technology employee of Autotrader and/or an outside consultant hired by Autotrader, or both, notified Autotrader's management and staff that its "counting" software was double counting certain SRPs and VDPs for all of its dealer customers, including the Plaintiffs.

58.    Despite being put on notice that its software was over counting Plaintiffs' and other dealers' SRPs and VDPs, and thus that Autotrader had been communicating false and inaccurate online advertising results to the Plaintiffs for at least years, Autotrader did not alert or notify its customers, including the Plaintiffs, of those facts.

59.    In fact, Autotrader thereafter continued to communicate the false and inaccurate monthly Dealer Scorecards to the Plaintiffs and to its other dealer customers.

60.    Upon information and belief, at some time between December 2014 and June 2015 Autotrader caused, or attempted to cause, its "counting" software to be reprogrammed such that it no longer double-counted certain SRPs and/or VDPs.

61.    However, even during that period of time Autotrader continued to disseminate, via e-mail, the false and misleading Dealer Scorecards to the Plaintiffs and to its other dealer customers.

62.    In early July 2015, the Plaintiffs received their monthly Dealer Scorecards for June 2014 via e-mail from Autotrader, which report stated a precipitous decline of between 40% to 60% in their SRPs from the same month of the previous year, as well as a significant decline from the immediately prior months, despite the fact that each Plaintiff had, in June 2015, listed a similar number of comparable vehicles for sale on Autotrader's platform.

63.    Unbeknownst to the Plaintiffs' management and its principal owner, the severe decline in the Plaintiffs advertising reach in June 2015, as reflected in the SRPs that Autotrader reported, was, upon information and belief, a result of the reprogramming of Autotrader's counting software in or about May 2015 such that the software was no longer double counting certain search results pages.

64.    A subsequent investigation, undertaken by a dealer operating in Bronx County and Westchester County, New York (the "Bronx-Westchester Dealer"), of this seemingly inexplicable decline in SRP results revealed the aforesaid information that indicated that

information and technology consultants had flagged Autotrader's counting software to have been inaccurate, in or about December 2014; that apparently in or about May or June 2015 Autotrader had caused the software to be reprogrammed; and that at no time had Autotrader given notice to its customers, including the Plaintiffs, that Autotrader had been communicating false and misleading advertising reach and effectiveness statistics to its dealer customers, including the Plaintiffs.

65.     In response, Autotrader, instead of finally disclosing to the Bronx-Westchester Dealer, to the Plaintiffs herein, and to all Class Members that it had been over counting and misrepresenting the SRPs and VDPs being received by the Plaintiffs and all Class Members, and instead of admitting that the decrease in the reported June 2015 SRPs and VDPs was due to the software reprogramming, at least three of Autotrader's representatives intentionally concocted and communicated to the Bronx-Westchester Dealer a series of false and misleading explanations.

66.     At all relevant times, defendant Autotrader carried out the foregoing scheme to deceive the Plaintiffs and the Class Members knowingly, willfully, and with the specific intent to defraud them by inducing them to enter into online advertising agreements and, thereafter, by inducing them to refrain from terminating or failing to renew their agreements.

67.     At all relevant times, the Plaintiffs were justified in relying upon Autotrader's representations as to the effective reach of the advertising that Autotrader would provide and was purportedly  providing, and the Plaintiffs did actually rely upon Autotrader's misrepresentations in deciding to enter into the online advertising agreement and, thereafter, in refraining from terminating or failing to renew that agreement.

68.     But for Autotrader's misrepresentations about the effectiveness of its advertising services, the Plaintiffs would not have entered into the online advertising agreement in the first instance and, thereafter, if not for each succeeding misrepresentation by Autotrader, the Plaintiffs would have terminated or failed to renew their agreements.

69.     During the course of the Plaintiffs' online advertising agreements(s) with Autotrader, and having been induced to enter into and to not terminate those agreements by Autotrader's ongoing misrepresentations, the Plaintiffs paid substantial advertising fees to Autotrader.

70.     Upon information and belief, each of Autotrader's dealer customers was subjected to the same or substantially similar misrepresentations by Autotrader as to the SRPs and VDPs that each such dealer was actually receiving via Autotrader's online advertising platform, and each such dealer suffered damages as a result thereof.

## CLASS ALLEGATIONS

71.     Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, as a class action under Federal Rule of Civil Procedure 23(a) and 23(b)(3) and, in the alternative, under Rule 23(b)(2) and/or 23(c)(4). This action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a) and the predominance and superiority requirements of Rule 23(b)(3).

72.     The class that Plaintiffs seek to represent (the "Class") is defined as follows:

> All automotive dealers in the United States that purchased online vehicle advertising services from Autotrader.com, Inc. prior to and including June 2015.

73.     Excluded from the Class are (1) the Defendant and any entity in which Defendant has a controlling interest, including their legal representatives, officers, directors, successors and assigns; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) government entities.

74.     Plaintiff reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or otherwise modified.

## Numerosity and Ascertainability

75.     While the exact number of Class Members is unknown to the Plaintiffs at this time, and can be determined only through discovery, membership in the class is ascertainable based upon the records of maintained by Autotrader.  Plaintiff is informed, and believes, that the Class includes thousands of dealers. Therefore, the Class is sufficiently numerous that joinder of all Class Members in a single action is impractical under Federal Rule of Civil Procedure 23(a)(1), and the resolution of their claims through the procedure of a class action will benefit the parties and the judicial system.

76.     The names and addresses of Class Members are available in Autotrader's records. Notice can be provided to members of the Class through mass mailing, by publication, or by utilizing other means of communication as may be approved by the Court, subject to Federal Rule of Civil Procedure 23.

## Commonality and Predominance

77.     Common questions of law and fact exist as to the Class Members, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual Class members within the meaning of Federal Rule of Civil Procedure 23(b)(3).

## Typicality

78.     Plaintiffs' underlying allegation to their claims that based upon Autotrader's misrepresentation of the nature and benefits of Autotrader's services are typical of the claims of all of Autotrader's dealer customers (Class Members) that Plaintiffs seek to represent under Federal Rule of Civil Procedure 23(a)(3) because it is believed that all customer dealers were provided similar erroneous data in a substantially similar form based in whole or in part upon a system-wide computer program or programs employed by Autotrader.

## Adequacy of Representation

79.     Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiffs are adequate representatives of the Class because they have no interests which are adverse to the interests of the Class members. Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of automotive dealers.

## Superiority

80.     A class action is superior to all other available methods for the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because the expense and burden of individual litigation makes it economically infeasible for Class members to seek redress for their claims other than through the procedure of a class action, and in turn the lack of any other viable method for seeking redress would immunize Autotrader's illegal and deceptive conduct.

81.     In the alternative, this action is certifiable under Federal Rule of Civil Procedure 23(b)(2) because:

      (a) The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members; and

      (b) The prosecution of separate actions by individual Class members would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other Class members not parties to the adjudications.

82.     In the alternative, an issue class under Federal Rule of Civil Procedure 23(c)(4) is certifiable for the sole issue of whether Autotrader's conduct constitutes a violation of RICO.

83.     Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

## COUNT I – CONSPIRACY TO VIOLATE RICO
### (18 U.S.C. § 1962) – Class Action

84.     This count is brought by the Plaintiffs and all Class Members against the Defendant Autotrader and its managers and representatives alleging a cause of action under 18 U.S.C. § 1962(d), for conspiring to violate 18 U.S.C. § 1962(c).

85.     At all relevant times, the Plaintiffs and the Defendant Autotrader's agents, employees and representatives were "persons" for the purposes of § 1961(3).

86.     At all relevant times, Autotrader, a corporation, was an "enterprise" for the purposes § 1961(4).

87.     All of the aforementioned e-mails, telephone calls, faxed communications, and internet postings on the set forth above were made in furtherance of Autotrader's scheme to defraud the Plaintiffs, and to subsequently cover-up the fraud scheme when dealers attempted to investigate the data discrepancies.

88.     Therefore all of the foregoing communications were made in violation of the mail and wire fraud statutes.

89.     The Plaintiffs were defrauded by one or more of the described mail and wire communications.

90.     Autotrader's pattern of fraudulent mail and interstate wire communications occurred over a period of time from at least as early as April 2010, or from the time that each Plaintiff was induced to contract for services with Autotrader, if after April 2010, until at least July 2015.

91.     Autotrader's fraudulent scheme and cover-up victimized many persons and automotive dealers in addition to the Plaintiffs herein.

92.     Thus, Plaintiffs assert claims against the Defendant for conspiring to violate § 1962(c), which prohibits any person employed by or associated with an enterprise from participating in the affairs of the enterprise through a pattern of racketeering activity.

93.     This conspiracy to violate § 1962(c) is a violation of § 1962(d).

## COUNT II – CONDUCT AND PARTICIPATION IN A RICO ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY (18 U.S.C. §§ 1961(5) AND 1962(C)) – CLASS ACTION

94.     Plaintiffs repeat and re-allege the allegations of Paragraphs 1-93 as if fully set forth herein.

95.     This count is brought by the Plaintiffs and all Class Members against the Defendant Autotrader and its employees, agents and representatives alleging a cause of action for violations of the RICO Act pursuant to 18 U.S.C. §§ 1961(5) and 1962(C).

## Predicate Criminal Violations of Federal Mail Fraud Statute (18 U.S.C. § 1341)

96.     The Defendant and its agents could be charged and convicted of multiple, related violations of law which form a pattern and practice and which violations are each potentially punishable by more than one year in jail, constituting mail fraud.

97.     Defendant and its agents acted in criminal violation of the federal mail fraud statute under 18 U.S.C. § 1341.

98.     18 U.S.C. § 1341 provides that:

"a. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both."

99.    Defendant, through its agents, utilized false or fraudulent pretenses, representations, and/or promises in order to defraud and/or obtain money from the Plaintiffs in the form of payments for online advertising services.

100.    In order to achieve or attempt to achieve the fraud described in the preceding paragraphs, Defendants' agents sent correspondence and other documents that were sent or delivered by the Postal Service and by electronic wire, including but not limited to the previously described Dealer Scorecards and Dealer Performance Reports.

**Predicate Criminal Violations of Federal Wire Fraud Statute (18 U.S.C. § 1343)**

101.    The Defendant and its agents could be charged and convicted of multiple, related violations of law which form a pattern and practice and which violations are each potentially punishable by more than one year in jail constituting wire fraud.

102.    The Defendant and its agents further acted in criminal violation of the federal wire fraud statute under 18 U.S.C. 1343.

103.     18 U.S.C. § 1343 provides that:

> a.  Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

104.     Defendant Autotrader and its agents, officers and employees, acting in concert with each other, devised or intended to devise a scheme or artifice meant to defraud and/or to obtain money or property from the Plaintiffs in the form of payments for online advertising services.

105.     Defendant, through its agents, officers and employees, acting in concert with each other, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice when they transmitted telephone and cellular telephone calls, documents, facsimiles, emails, instant messages, and other forms of communications, in violation of 8 U.S.C. § 1343.

106.     At the various times and places partially enumerated herein, Defendant Autotrader did, through the actions of its officers, employees and agents, associate in a RICO enterprise whose activities did affect, interstate and foreign commerce.

107.     Defendant, through its officers and employees, did conduct and/or participate, either directly or indirectly, the affairs of said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c)

108.    By virtue of the predicate acts described in this Complaint, including without limitation, Defendant Autotrader's agents' repeated and continuous acts of mail fraud and wire fraud, Defendant transferred, received, and furthered the generation of income that was derived, both directly and indirectly, from a pattern of racketeering activity in which Defendant Autotrader participated along with its agents, officers and employees.

109.    The Defendant and its officers and employees participated as principals in the enterprise, and used and invested, both directly and indirectly, such income from the enterprise and the proceeds of such income, in establishing, operating and furthering the illegal enterprise in violation of 18 U.S.C § 1962(a).

110.    Plaintiffs further allege that the Defendant and its agents did commit two (2) or more of the offenses itemized above in a manner which its officers and employees calculated and premeditated intentionally to enable the continuity of the racketeering enterprise, also in violation of the RICO law at 18 U.S.C. § 1962(b).

111.    As a direct and proximate result of the Defendant's and its agents' violations of 18 U.S.C. § 1962(a), the Plaintiffs suffered the loss of valuable property, financial services and support, and suffered other business and pecuniary damages.

112.    Plaintiffs demand that judgment be entered against the Defendant, including an award of trebled damages, pursuant to 18 U.S.C. § 1964(c), compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-judgment interest, costs, and any other relief that this Court deems just and proper.

## COUNT III – DECEPTIVE ACTS AND PRACTICES
## UNDER NEW JERSEY STATUTES § 56:8-2 ET SEQ.

113.    Plaintiffs Fairfield Motors and Adjess Motors repeat and re-allege the allegations of Paragraphs 1-83 as if fully set forth herein.

114.    As its third ground for relief, the Plaintiffs Fairfield Motors and Adjess Motors claim that Defendant committed deceptive acts and practices pursuant to New Jersey's Consumer Fraud Protection Act, N.J. Statutes § 56:8-2.

115.    Each of said Plaintiffs and the Defendant Autotrader and its agents and employees are "persons" within the meaning of N.J. Statutes § 56:8-1(d)

116.    Defendant Autotrader has at all material times furnished its online advertising services in the State of New Jersey and has specifically done so with regard to the said Plaintiffs as described herein.

117.    Autotrader has made, and is continuing to make, false, deceptive and misleading descriptions and representations of fact in its communications to existing and prospective automotive dealers in general, and to the said Plaintiffs in particular.

118.    New Jersey Statutes 56:8-2 prohibits any business such as Autotrader from the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or service.

119.     As described supra, Defendant Autotrader provided and furnished to the said

Plaintiffs, on at least a monthly basis, documents that misrepresented the extent of advertising

reach Autotrader's website would provide, and was providing, to the Plaintiffs, for the purpose

of, initially, inducing Plaintiffs to become Autotrader customers and, subsequently, to remain as

Autotrader customers.

120.     In addition, Defendant Autotrader, by its agents, communicated similar

misrepresentations verbally to the Plaintiffs' agents, which communications misled the said

Plaintiffs as to the advertising reach Autotrader's website would provide, and was providing, to

said Plaintiffs, for the purpose of, initially, inducing Plaintiffs to become Autotrader customers

and, subsequently, to remain as Autotrader customers.

121.     Each of the foregoing instances of misrepresentation constituted a separate

instance of fraud and misrepresentation in violation of N.J. Statutes § 56:8-2.

122.     These violations have injured the said Plaintiffs in their business, and induced the

said Plaintiffs to pay and/or overpay to the Defendant at least the total sum of $413,241.29

during the course of Plaintiffs' and Defendant's online advertising agreements.

123.     Pursuant to N.J. Statutes § 56:8-2, Plaintiffs together are entitled to an award of

damages in the amount of $413,241.29 for the deceptive acts committed by the Defendant, as

describe herein.

124.     By reason of the foregoing, Plaintiffs are entitled to recover said damages, plus

punitive damages and their reasonable attorneys' fees, in an amount to be determined at trial.

## COUNT IV – DECEPTIVE AND UNFAIR TRADE PRACTICES UNDER
## 73 PENNSYLVANIA STATUTES § 201-1, ET SEQ.

125.    Plaintiff Alfred Stein, Inc. repeats and re-alleges the allegations of Paragraphs 1-83 as if fully set forth herein.

126.    As its fourth ground for relief, Plaintiff Alfred Stein, Inc. claims that Defendant Autotrader  engaged in repeated acts and conduct that violated 73 Pennsylvania Statutes § 201-1, et seq. (the "UTPCPL").

127.    Autotrader at all material times furnished its services in the State of Pennsylvania, to the said Plaintiff and to all other of its dealer customers that operate or operated in Pennsylvania.

128.    Within the meaning of the UTPCPL, Autotrader has engaged in "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" on the said Plaintiff's part as to the nature and quality of the services that Autotrader offered to the Plaintiff and that Autotrader was actually providing to the Plaintiff.

129.    73 Pennsylvania Statutes § 201-1, et seq.  prohibit any business such as Autotrader from engaging in false advertising, which includes the dissemination of information that is incorrect, misleading, or fails to reveal material facts about the business or the products and services that the business offers.

130.    As described supra, Defendant Autotrader, between April 2010 and June 2015, provided and furnished to Plaintiff, on at least a monthly basis, documents that misrepresented the extent of the advertising reach that Autotrader's website would provide, and was providing,

to Plaintiffs, for the purpose of, initially, inducing Plaintiff to become an Autotrader client and, subsequently, to remain as a client.

131.    Each of the foregoing instances of misrepresentation constituted a separate act of "fraudulent" or recklessly false misrepresentation for the purposes of 73 Pennsylvania Statutes § 201-1, et seq.

132.    The foregoing violations have injured Plaintiff in its business, and fraudulently induced the Plaintiff to pay to the Defendant a total sum exceeding $1,000,000.00 during the course of Plaintiff's and Defendant's online advertising agreements.

133.    Pursuant to 73 Pennsylvania Statutes § 201-1, et seq., Plaintiff is entitled to an award of damages in an amount exceeding $1,000,000.00.

134.    By reason of the foregoing, Plaintiff is entitled to recover its compensatory damages, punitive and its reasonable attorneys' fees, in an amount to be determined at trial.

## COUNT V – BREACH OF CONTRACT AND WARRANTY

135.    Plaintiffs repeat and re-allege the allegations of Paragraphs 1-83 as if fully set forth herein.

136.    There existed an agreement or agreements between each Plaintiff (and each Class Member) and the Defendant whereby the Plaintiffs would pay the Defendant in exchange for the aforedescribed online advertising services, which agreements did constitute valid and enforceable contracts between the Plaintiffs and the Defendant.

137.    The aforesaid agreements were, upon information and belief, terminable by the Plaintiffs at will or on a monthly basis.

138.    The Plaintiffs duly performed all of their obligations pursuant to the agreement(s) between themselves and the Defendant.

139.    Pursuant to the agreements, Autotrader expressly promised that the advertising reach, i.e., the SRPs and VDPs that Autotrader would provide, and was providing, to the Plaintiffs through its website was consistent with the performance data that the Defendant was communicating to the Plaintiffs on an ongoing basis.

140.    The SRPs and VDPs that the Plaintiffs would receive, and were supposedly receiving, were an integral part of the basis of the bargain between the parties.

141.    Defendant Autotrader materially breached its agreements with the Plaintiffs by failing to provide the advertising reach and effectiveness that Autotrader promised to provide, and represented that it was providing, to the Plaintiffs.

142.    Plaintiffs have suffered direct, general damages, as well as special, consequential damages, as a result of Defendant Autotrader's breach of its agreements with the Plaintiffs.

143.    As a proximate result of the Defendant's breach of its contractual duties and obligations, Plaintiffs and all Class Members have been damaged in an amount to be proven at trial and estimated to equal or exceed One Billion Dollars ($1,000,000,000.00), plus pre-judgment interest.

## COUNT VI – BREACH OF THE COVENANT OF GOOD FAITH
## AND FAIR DEALING

144.    Plaintiffs individually and on behalf of all Class Members repeat, reiterate and reallege each of the allegations contained in paragraphs 1 through 80 and 136 through 143 of this Complaint as if set forth more fully and at length herein.

145.    The agreement between the parties, like all contracts subject to New Jersey Law, Pennsylvania Law, and the law of each state within the United States, contains an implied covenant of good faith and fair dealing.

146.    By its conduct alleged herein, Autotrader, through its agents and employees, has breached the implied covenant of fair dealing.

147.    Autotrader, through its agents and employees, has acted to deny the Plaintiffs the reasonably expected benefits that the Plaintiffs bargained for in entering into the online advertising agreement(s) with Autotrader.

148.    As a result of the Defendant's bad faith conduct and wrongful acts as set forth above, the Defendant has breached the covenant of good faith and fair dealing implied in all contracts.

149.    As a result of the Defendant's breach of the implied covenant of good faith and fair dealing, the Plaintiffs have sustained substantial damages in an amount to be determined at trial and estimated to equal or exceed One Billion Dollars ($1,000,000,000.00), plus pre-judgment interest.

## COUNT VII – UNJUST ENRICHMENT

150.     Plaintiffs individually and on behalf of all Class Members repeat, reiterate and reallege each of the allegations contained in paragraphs 1 through 83 supra as though fully set forth herein.

151.     By reason of the facts alleged herein, Defendant Autotrader has been unjustly enriched by retaining the sums of money paid by Plaintiffs for online advertising services, which sums greatly exceeded the fair market value of the services that Autotrader provided.

152.     Defendant Autotrader's enrichment as a result thereof is unjust and comes at the expense of the Plaintiffs.

153.     It is against equity and good conscience to permit Autotrader to retain what it has unjustly procured.

154.     As a result thereof, Plaintiffs have sustained substantial damages in equity in an amount to be determined at trial and estimated to equal or exceed One Billion Dollars ($1,000,000,000.00), plus pre-judgment interest.

## COUNT VIII – FRAUDULENT INDUCEMENT

155.     Plaintiffs individually and on behalf of all Class Members repeat, reiterate and re-allege each of the allegations contained in paragraphs 1 through 83 and 136 through 143 as if set forth more fully and at length herein.

156.     In deciding to purchase Defendant Autotrader's online advertising services, and in refraining from terminating or not renewing the online advertising agreement on an ongoing basis, Plaintiffs reasonably relied upon the promises, representations and warranties of

Autotrader as to the advertising reach that the Plaintiffs would enjoy, and that Plaintiffs were in fact receiving.

157.    The Defendant's representations, however, were materially false and misleading in that, among other things, the number of SRPs and VDPs that Autotrader represented were being received by the Plaintiff and all Class Members were, in fact, inflated by between fifty percent (50%) and one hundred percent (100%) or more.

158.    The Defendant's representations were also materially false and misleading in that, among other things, the number of SRPs and VDPs that Autotrader represented were being received by Plaintiffs were, in fact, inflated by between fifty percent (50%) and one hundred percent (100%) or more.

159.    The Defendant's representations were also materially false and misleading in that even after Autotrader had been put on notice of its own misrepresentations regarding Plaintiffs' SRPs and VDPs, and even after Autotrader had reprogrammed its counting software, Autotrader continued to actively mislead Plaintiffs as to the real reason that the Plaintiffs' advertising reach metrics had suddenly declined beginning in or about June 2015.

160.    In addition, even after Autotrader had been put on notice of its own misrepresentations regarding Plaintiffs' SRPs and VDPs, and even after Autotrader had reprogrammed its counting software, Autotrader continued to mislead the Plaintiffs by omitting from its communications with certain Class Members the real reason that the Plaintiffs' and the Class Members advertising reach metrics had suddenly declined beginning in or about or June 2015.

161.    The Defendant made the foregoing false representations, and concealed material facts, with the intent of inducing the Plaintiffs to rely to their detriment upon those false statements of fact and omissions of fact by obligating themselves to the ongoing purchase of Defendant's online advertising services.

162.    The Plaintiffs did in fact rely, reasonably and to their detriment, upon the foregoing material misrepresentation and omissions of the Defendant.

163.    Upon information and belief, the Defendant's fraud as described was also carried out against all Class Members, which constituted a harm to the general public and to the automotive market and the online advertising market.

164.    By reason of the foregoing, the Defendant committed fraud in the inducement, and the Plaintiffs and the Class Members have been injured in an amount to be determined at trial, but which is believed to be in excess of One Billion Dollars ($1,000,000,000.00), plus pre-judgment interest, plus an additional sum for exemplary and punitive damages in an amount to be determined at trial.

## COUNT IX – NEGLIGENT MISREPRESENTATION

165.    Plaintiffs individually and on behalf of all Class Members repeat, reiterate and re-allege each of the allegations contained in paragraphs 1 through 80 and 136 through 143 as if set forth more fully and at length herein.

166.    The relationship between Plaintiffs and the Defendant Autotrader constituted a special relationship of trust or confidence, which created a duty on the part of the Defendant to impart accurate information to Plaintiffs.

167.     The Defendant at all relevant times knew or should have known have known through reasonable due diligence that its software was inflating the number of SRPs and VDPs that were being achieved by its dealer customers, including the Plaintiffs.

168.     The Defendant at all relevant times knew or should have known that the reports that it provided to the Plaintiffs stated inflated, inaccurate numbers of SRPs and VDPs being achieved by its dealer customers, including the Plaintiffs.

169.     The Defendant's aforesaid statements were false or incorrect and were made negligently and/or recklessly under the circumstances.

170.     The Plaintiffs reasonably relied upon the Defendant's statements in deciding to initially purchase Defendant's online advertising services, as well as to remain as Autotrader clients throughout the course of their relationship.

171.     By reason of the foregoing, Plaintiffs have been injured in an amount to be determined at trial, but which is believed to be in excess of One Billion Dollars ($1,000,000,000.00), plus pre-judgment interest.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims as to which a jury trial is permitted.


BELLAVIA BLATT & CROSSETT, PC

By: _____/s/_____

Leonard A. Bellavia  (lbellavia@dealerlaw.com)
Shaun M. Malone (smalone@dealerlaw.com)
200 Old Country Road, Suite 400
Mineola, NY 11501
*Attorneys for the Plaintiffs*